COMMONWEALTH of Pennsylvania, Appellee

v.

Robert MORRIS, Sr., Appellant.

Superior Court of Pennsylvania.

Argued May 15, 2008.

Filed Oct. 1, 2008.

David Rudenstein, Philadelphia, for appellant.

Max Kaufman, Asst. Dist. Atty., for Com., appellee.

BEFORE: FORD ELLIOTT, P.J., MUSMANNO, LALLY–GREEN, BENDER, BOWES, PANELLA, DONOHUE, SHOGAN and ALLEN, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 Robert Morris, Sr., ("Morris") appeals from the judgment of sentence imposed following his convictions of two counts of murder of the third degree. *See* 18 Pa.C.S.A. § 2502(c). We granted *en banc* review in order to determine whether Morris could be sentenced to a mandatory term of life in prison pursuant to 42 Pa. C.S.A. section 9715 where the trial court convicted Morris of two separate murders at the same trial and subsequently sentenced him on the same date for both counts. We affirm.

¶ 2 The trial court has summarized the underlying facts as follows:

On June 4, 1995, at approximately 9:57 a.m., Philadelphia Police Office[r] David Soto responded to 1746 Church Lane in the City and County of Philadelphia pursuant to a radio call. He was met there by fire rescue who directed him to the second floor apartment where he observed two little girls, later identified as LaShai Payne, age five months, and Shanara Payne, age eighteen months, dead on a bed. The children's mother, Damika Payne, told police that she and [Morris], the children's father[,] had put the children to bed at about 8:00 p.m. the previous night. Both were present in the bedroom when the children were found not breathing and paramedics were called. There were no signs of forced entry. Following the post-mortem examination by the Phila-

delphia County Medical Examiner, the cause of death for both children was listed as asphyxia and the manner of death was ruled as homicide. No arrests were made.

On October 28, 2002, Kerry Longacre, [Morris's] girlfriend at the time, was asleep in her bedroom in the house she shared with her mother, her mother's male friend and [Morris] at 486 Shurs Lane in Philadelphia. She heard [Morris], who had been asleep on the couch in the living room with his and Ms. Longacre's twenty-seven day old son[,] Robert [Isaiah] Morris, scream that something was wrong with the baby. [Morris] stated that the baby was not breathing. When she came into the living room, she observed [Morris] performing CPR on the baby. Longacre called 911. Paramedics arrived and transported the baby to nearby Roxborough Memorial Hospital where he died. Philadelphia Police Officer Brian Malone went to Roxborough Hospital upon hearing of the sudden death. When he arrived at approximately 2:00 or 3:00 a.m., he observed [Morris] and Longacre in the parking lot of the hospital sitting on a curb. [Morris] had his arm around Longacre, consoling her. [Morris] appeared to look in the Officer's direction and, as Officer Malone watched, [Morris] began to scream and punch the air. Officer Malone noted the behavior, but did not exit his patrol car.

Philadelphia Police Detective John Geliebter of Northwest Detective Division was assigned to investigate the sudden death. When he arrived at Roxborough Hospital about 2:48 a.m., he [also] observed [Morris] and Longacre sitting on a curb in the emergency room parking lot. [Morris] looked in his direction and began to act visibly more upset.

Detective Geliebter spoke with [Morris] and Longacre briefly about the baby's death, then went in to speak with the emergency room physician. As a result of the conversation, [Detective] Geliebter obtained a search warrant for 486 Shurs Lane. Pursuant to the warrant, the Detective took photographs of the premises and collected a blood stained blanket. After speaking with the medical examiner, the items were returned.... The post[-]mortem examination revealed no external signs of injury, other than a pinkish serosanguineous fluid around the mouth which is commonly found in cases of sudden infant death syndrome (SIDS; now referred to as sudden unexplained infant death). The internal examination revealed that Robert had dusky colored brain tissue and congestion and fluid in his lungs, conditions commonly found in SIDS and in cases where cardiopulmonary resuscitation has been attempted. No drugs were detected in the baby's system. The microscopic examination revealed pinpoint hemorrhages over the lungs and chest cavity also consistent with SIDS and resuscitation. The only finding of significance was pulmonary hemosiderin laden macrophages, evidence that blood was released into the air sacs of the child's lungs long enough prior to death that the white blood cells responded in an attempt to rid the body of the dead cells. This condition is not uncommon in a normal vaginal delivery. As a result of these findings, Robert's death was ruled SIDS and the manner of death, natural.

Following the sudden death of Robert [Isaiah], [Morris] and Longacre continued as boyfriend and girlfriend and Longacre became pregnant again. Another son, Jhayden Robert Morris, was born on September 9, 2003. Prior to the birth of Jhayden Robert, [Morris] and Longacre took various classes on how to perform cardiopulmonary resuscitation (CPR) on infants. They were instructed that CPR is performed with two fingers on infants as opposed to two hands as with adults because infants are much more delicate. They were also instructed in the proper use of an apnea monitor, a monitor which measures an infant's heart rate and respiration. Jhayden was placed on an apnea monitor in the hospital when he was born. Longacre and [Morris] were given instructions by the hospital staff that the monitor was to be used on Jhayden at all times. However, [Morris] removed the monitor at the hospital indicating to Longacre that he did not want the monitor on Jhayden and that [Morris] would keep [track] of Jhayden's breathing.

Shortly after Jhayden's birth, Longacre returned to the job she had held prior to Jhayden's birth at Roxborough Memorial Hospital. On December 12, 2003, Longacre left home to work the 2:30 p.m. to 11:30 p.m. shift. She left Jhayden in [Morris's] care. When Longacre left for work, Jhayden had a cold, cough and a runny nose. She called home to check on [Jhayden] and [Morris] told her that the baby was fine. Longacre's mother, Eileen Regan[,] who also lived at 486 Shurs Lane[,] arrived home from work at approximately 6:00 p.m. Regan asked about Jhayden and [Morris] told her that Jhayden was fine [and that] he was asleep. Regan went to her room and fell asleep. At approximately 9:00 p.m., she awoke and went to the bathroom. She startled [Morris,] who was in the bathroom wiping something up from the floor with his foot and a sweatshirt jacket. [Morris] threw the jacket into the dirty clothes. Not suspecting anything unusual, Regan returned to her room. Longacre returned

home from work at approximately 11:15 p.m. She spoke with [Morris] and her mother briefly, then went upstairs to check on Jhayden. She found him lying in his bassinet on his side, not breathing. She picked Jhayden up and screamed for [Morris] as she ran back downstairs with the baby. [Morris] ran in from the porch and began CPR on the baby. Regan heard her daughter scream that the baby was not breathing. Regan called 911, then assisted [Morris] in giving CPR to the infant. Longacre returned upstairs and called 911 again. Officer Malone received the radio call of a person screaming at 486 Shurs Lane. He arrived to find Longacre screaming that her baby was not breathing. Officer Malone entered the premises and observed the baby on the couch with [Morris] performing CPR, hand over hand instead of with two fingers as is appropriate for an infant that size and consistent with the CPR training they had received. [Morris] shook the baby then grabbed the baby's head and was blowing into the baby. Officer Malone thought [Morris] was handling the baby extremely roughly and took the baby from [Morris]. The baby was then transferred to Roxborough Hospital[,] where he died. Lieutenant George McClay of Northwest Detective Division was involved in the investigation of the sudden death of Jhayden at 486 Shurs Lane, and was discussing the case with his partner [Detective] Davis. They were overheard by [Detective] Geliebert who told them he had been there the previous year for a sudden infant death. Lieutenant McClay went to the house on Shurs Lane, then to Roxborough Hospital. He spoke with the emergency room doctor, observed Jhayden's body, then spoke with the family. During the interview, [Morris] became loud and began to scream that the police had killed his baby.

An autopsy was performed on Jhayden, within twelve hours of his death, by Dr. Leslie Tull in collaboration with Deputy Medical Examiner [Dr. Ian Hood]. The external examination showed no signs of injury. The gross internal exam showed the same dusky congested brain tissue as found in Robert [Isaiah], and blotchy congested looking lungs but nothing suspicious. However, the microscopic examination showed a patchy bronchiopneumonia and edematous congested lung tissue. As a result, Dr. Hood determined the cause of death to be pneumonia, asphyxia not excluded, and the manner of death undetermined.

Some of the police officers that responded to the sudden death of Jhayden were aware of the death of Robert [Isaiah] and gave that information to the medical examiner's office. Because of the rarity of consecutive SIDS deaths in one household, the Medical Examiner's officer began further investigation into the deaths of Robert [Isaiah] and Jhayden, suspicious of a lethal gene or metabolic disorder. Additionally, a family member of Longacre informed Dr. Hood about the deaths of [Morris's] first two children, LaShai and Shanara Payne. Further investigation revealed that [Morris] was present at the scene of their deaths in each case. This investigation prompted Dr. Hood to go back and change the cause of death on [Robert Isaiah's] death certificate from SIDS, contributory cause pulmonary hemorrhage, manner of death natural, to asphyxia manner of death homicide.

Trial Court Opinion, 1/22/07, at 1–7 (footnote omitted).

¶ 3 The Commonwealth charged Morris with four counts of murder for the deaths of Shanara, LaShai, Robert Isaiah, and

Jhayden. While awaiting trial, Morris was incarcerated in Curran Fromhold Correctional Facility in Philadelphia County. Two inmates in prison with Morris stated that Morris told them that he had killed his kids by smothering them and that he should not have done that. The case proceeded to a jury trial on January 23, 2006, before the Honorable Sheila Woods–Skipper. On February 6, 2006, the jury convicted Morris of two counts of murder of the third degree relating to the deaths of Robert Isaiah and Jhayden. The jury acquitted Morris of killing Shanara and La-Shai. On March 6, 2006, the trial court sentenced Morris to twenty to forty years in prison for the Robert Isaiah murder. The trial court then sentenced Morris to a mandatory term of life in prison for the Jhayden Morris murder. In imposing this sentence, the trial court relied upon 42 Pa.C.S.A. section 9715(a), which states that any person convicted of murder of the third degree and who had been previously convicted at any time of murder or voluntary manslaughter must be sentenced to life in prison. On March 13, 2006, Morris filed a post-sentence Motion challenging the weight of the evidence. Morris also filed a Motion for reconsideration of sentence, alleging that the trial court had erred as a matter of law in imposing a sentence of life in prison. The trial court denied both of these Motions.

¶ 4 Morris now appeals, raising the following questions for our review:

I. Should [Morris] be awarded an arrest of judgment on all charges including two Counts of Murder in the Third Degree where the evidence is insufficient to prove that he perpetrated any crime including two Counts of Murder in the Third Degree, where the Commonwealth has failed to prove its case on any charge beyond a reasonable doubt and where the Commonwealth has failed to prove that [Morris] was actually the perpetrator of the crime?

II. Is [Morris] entitled to a new trial on all charges including two Counts of Murder in the Third Degree where the verdict is against the weight of the evidence and where the Commonwealth simply could not prove that [Morris] was the perpetrator of any crime?

III. Is [Morris] entitled to a new Sentencing Hearing where the Honorable Court legally erred at time of sentencing when it determined that it must impose a mandatory term of Life Imprisonment on each Count of Third Degree Murder where [Morris] stood trial, at the same time, on two Counts of Murder and where [Morris] was convicted on the same date of two Counts of Murder and thereafter sentenced on the same date for both Counts?

Brief for Appellant at 3.

¶ 5 In his first claim, Morris contends that the evidence was insufficient to support his two convictions of murder of the third degree. *Id.* at 11.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.

Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bruce*, 207 Pa.Super. 4, 916 A.2d 657, 661 (2007) (citation omitted).

¶ 6 "Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Tielsch*, 934 A.2d 81, 94 (Pa.Super.2007) (citation omitted); *see also Commonwealth v. Santos*, 583 Pa. 96, 876 A.2d 360, 363 (2005). "Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa.Super.2007).

¶ 7 Morris argues that the evidence was legally insufficient because he never confessed to his cellmate, Robert Amoroso ("Amoroso"), that he killed Robert Isaiah and Jhayden, there was no forensic evidence to support the verdict, there was no circumstantial evidence tying him to the killings, and that the testimony of Dr. Hood was not credible and was based upon faulty assumptions. Brief for Appellant at 12, 21–22. Morris specifically argues that the foundation of Dr. Hood's testimony,

which relied on the fact that Morris was the sole caretaker of the children, was not supported by the facts, therefore, rendering Dr. Hood's medical opinion unbelievable. *Id.* at 12–14. Morris claims that Dr. Hood would have classified the cause of death as SIDS if Dr. Hood had known that Morris was not the caretaker. *Id.* at 20.

¶ 8 We will first address Morris's attack on Dr. Hood's testimony. Here, Morris's argument is based upon Dr. Hood's statement regarding Morris's caretaker status. However, a review of Dr. Hood's testimony as a whole reveals that he based his opinion of the cause of death on the fact Morris had been present at the scene when each of his four children died after they were found not breathing. N.T., 1/26/06, at 84–85. In fact, Morris was alone with Robert Isaiah when he died. N.T., 1/24/06, at 241–42. Further, the record reflects that Morris was taking care of Jhayden when Jhayden stopped breathing and subsequently died. *Id.* at 205–07; N.T., 1/25/06, at 42–43. Morris, himself, testified that he was the primary caretaker of Jhayden. N.T., 1/27/06, at 189 (indicating that Morris testified to being the person who took care of the baby the most). Further, Dr. Hood specifically testified that Robert Isaiah and Jhayden were each asphyxiated to death. N.T., 1/26/06, at 85, 101. Morris's entire argument is a product of semantics as Dr. Hood based his opinion on Morris's proximity and relationship to all of the children. Accordingly, Morris has not shown that Dr. Hood's testimony was based upon a false foundation or that it was not credible.

¶ 9 Further, while Morris was incarcerated awaiting trial, he confessed to Amoroso that he had "killed his kids" and that he "shouldn't have did it." N.T., 1/25/06, at 187–88. Morris argues that this statement was not specific enough to demonstrate that he actually killed Jhayden and

Robert Isaiah. However, Morris's argument only attempts to weigh the evidence in his favor and does not provide any specific grounds to find the evidence insufficient. Moreover, Morris disregards the ample circumstantial evidence presented by the Commonwealth, including the deaths of Morris's other two children from asphyxiation, the bloody blanket found at the scene of Robert Isaiah's death, Morris's performance of CPR on Robert Isaiah and Jhayden with two hands instead of the medically approved two fingers, his rough treatment of Jhayden, and his repeated disconnections of Jhayden's apnea monitor. N.T., 1/24/06, at 28–30, 106, 185; N.T., 1/25/06, at 106–07, 135–36; N.T., 1/26/06, at 54. The jury was free to weigh all of the above evidence, including Dr. Hood's and Amoroso's testimony, and make any reasonable inferences therefrom. Thus, we conclude that the Commonwealth met its burden and the evidence was sufficient to support the convictions.

 ¶ 10 In his second claim, Morris contends that the verdicts were against the weight of the evidence. Brief for Appellant at 25–26. Morris again argues that Dr. Hood's testimony was based upon faulty assumptions and therefore his testimony was not credible. *Id.* at 26. Morris further argues that testimony he presented concerning his good character should have been given more weight in determining whether Morris had committed the murders. *Id.* at 27.

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock

one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003) (citations omitted).

¶ 11 Here, the trial court found that the verdicts were not against the weight of the evidence. Trial Court Opinion, 1/22/07, at 12. Morris's entire argument is premised upon the weight that the jury should have afforded Dr. Hood's testimony and Morris's character testimony. As noted above, Dr. Hood did not base his findings upon Morris's caretaker status, but on the fact that he was the father of all of the children and was present when each of the children were discovered not breathing and died. N.T., 1/26/06, at 84–85. Furthermore, Morris's introduction of testimony regarding his good behavior does not demonstrate that the Commonwealth's evidence was unbelievable thereby rendering the verdicts against the weight of the evidence. Indeed, as noted above, the trier of fact is free to believe all, part or none of the evidence and must determine the credibility of the witnesses. *See Champney*, 832 A.2d at 408. Based upon the evidence presented, the trial court did not abuse its discretion in denying Morris's weight of the evidence claim.

 ¶ 12 In his third claim, Morris contends that the trial court misconstrued and imposed an illegal sentence under 42 Pa.C.S.A. section 9715 when it sentenced him to a mandatory term of life in prison for the killing of Jhayden. Brief for Appellant at 28, 30. It is well-settled that a criminal defendant "may appeal as of right

the legality of the sentence." 42 Pa.C.S.A. § 9781(a); *Commonwealth v. Ausberry,* 891 A.2d 752, 754 (Pa.Super.2006).

> The scope and standard of review applied to determine the legality of a sentence are well established. If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. In evaluating a trial court's application of a statute, our standard of review is plenary and is limited to determining whether the trial court committed an error of law.

*Commonwealth v. Leverette,* 911 A.2d 998, 1001–02 (Pa.Super.2006) (internal citations omitted).

¶ 13 Here, Morris argues that the trial court was precluded from applying section 9715 because he was arrested at the same time for the murders of Robert Isaiah and Jhayden, the two murder charges were tried by a jury at the same time and he was sentenced on the two murder convictions at the same time. Brief for Appellant at 28, 30. Morris asserts that the statute is only applicable where a criminal defendant's prior murder conviction and sentence antedates the defendant's carrying out of the second murder. *Id.* at 28. Morris maintains that the trial court cannot, at the same sentencing hearing, impose a sentence for one murder conviction and then utilize that conviction to apply the mandatory sentencing statute to impose a life sentence on the second murder conviction. *Id.* at 28, 30. In effect, this Court must determine whether the trial court may sentence a criminal defendant to life in prison under section 9715 where the two murders were tried and sentenced together under a multiple-count criminal complaint.

¶ 14 Section 9715 states the following, in relevant part:

**§ 9715. Life imprisonment for homicide**

**(a) Mandatory life imprisonment.**— Notwithstanding the provisions of section 9712 (relating to sentences for offenses committed with firearms), 9713 (relating to sentences for offenses committed on public transportation) or 9714 (relating to sentences for second and subsequent offenses), any person convicted of murder of the third degree in this Commonwealth who has previously been convicted at any time of murder or voluntary manslaughter in this Commonwealth or of the same or substantially equivalent crime in any other jurisdiction shall be sentenced to life imprisonment, notwithstanding any other provision of this title or other statute to the contrary.

**(b) Proof at sentencing.**—Provisions of this section shall not be an element of the crime and notice thereof to the defendant shall not be required prior to conviction, but reasonable notice of the Commonwealth's intention to proceed under this section shall be provided after conviction and before sentencing. The applicability of this section shall be determined at sentencing....

42 Pa.C.S.A. § 9715(a), (b).

¶ 15 In interpreting any statute, appellate courts must take note of the principles of statutory interpretation and construction. The principal objective of interpreting a statute is to effectuate the intention of the legislature and give effect to all of the provisions of the statute. 1 Pa.C.S.A. § 1921(a); *Commonwealth v. Drummond,* 775 A.2d 849, 855–56 (Pa.Super.2001) (*en banc*) (stating that appellate courts must evaluate each section of a statute because there is a presumption

that the legislature intended for the entire statute to be operative). "In construing a statute to determine its meaning, courts must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words." *In re Jacobs,* 936 A.2d 1156, 1163 (Pa.Super.2007) (quoting *Commonwealth v. Lopez,* 444 Pa.Super. 206, 663 A.2d 746, 748 (1995)). When analyzing particular words or phrases, we must construe them "according to rules of grammar and according to their common and approved usage." 1 Pa.C.S.A. § 1903(a). "Words of a statute are to be considered in their grammatical context." *Drummond,* 775 A.2d at 856 (citation omitted). "Furthermore, we may not add provisions that the General Assembly has omitted unless the phrase is necessary to the construction of the statute." *Id.* (citation omitted); *see also Jacobs,* 936 A.2d at 1163 (stating that "[t]his Court does not have the authority to insert a word or additional requirement into a statutory provision where the legislature has failed to supply it."). A presumption also exists that the legislature placed every word, sentence and provision in the statute for some purpose and therefore courts must give effect to every word. *Commonwealth v. Ostrosky,* 589 Pa. 437, 909 A.2d 1224, 1232 (2006).

■ ¶ 16 Initially, we note that our Court has previously concluded that section 9715 is explicitly and unambiguously written, a point Morris acknowledges. *See Commonwealth v. Marks,* 704 A.2d 1095, 1100–01 (Pa.Super.1997), *appeal denied,* 555 Pa. 687, 722 A.2d 1056 (Pa.1998) (quoting *Commonwealth v. Gonzales,* 415 Pa.Super. 564, 609 A.2d 1368, 1373 (1992) (stating that section 9715 is unambiguous and clear and must be applied as written)); *see also Commonwealth v. Lark,* 350 Pa.Super. 558, 504 A.2d 1291, 1296 (1986)

(stating that the statutory language of section 9715 is explicit and should be construed as written). First, the plain language of the statute indicates that the statute is not implicated until sentencing. *See* 42 Pa.C.S.A. § 9715(b) (stating that "[t]he applicability of this section shall be determined at sentencing."); *Gonzales,* 609 A.2d at 1373. Therefore, to apply the statute, the trial court must, at sentencing, determine whether the defendant "has previously been convicted *at any time* of murder or voluntary manslaughter in this Commonwealth or of the same or substantially equivalent crime in any other jurisdiction." 42 Pa.C.S.A. § 9715(a) (emphasis added). The operative words of the statute are "at any time" and in analyzing these words, we must construe them according to their common usage. " 'At any time' ... clearly means that the order of commission, or conviction, of the offenses requiring a life sentence is immaterial so long as, at time of sentencing on a third[-]degree murder conviction, a defendant has been convicted on another charge of murder or voluntary manslaughter." *Gonzales,* 609 A.2d at 1373; *accord Marks,* 704 A.2d at 1100–01. Therefore, the trial court did not commit legal error in imposing the sentence of life in prison because the plain language of the statute specifies that the timing of the primary conviction is not relevant as long as the defendant had been convicted of the initial murder or manslaughter at the time of sentencing on the second murder.

■ ¶ 17 We take direction from the Supreme Court of Pennsylvania, which analyzed a different, but similarly worded, sentencing statute. In *Commonwealth v. Vasquez,* 562 Pa. 120, 753 A.2d 807 (2000), the Supreme Court determined that one conviction in a multiple-count drug trafficking criminal complaint could be used to enhance the sentence of another conviction

in the same complaint under 18 Pa.C.S.A. § 7508(a)(3)(i), **Drug trafficking sentencing and penalties.** *Vasquez*, 753 A.2d at 808–09. The Supreme Court found that the language of the statute was unambiguous and focused its analysis on the following sentence: "[If] at the time of sentencing the defendant has been convicted of another drug trafficking offense...." *Id.* at 808 (quoting 18 Pa.C.S.A. § 7508(a)(3)(i)). The Supreme Court concluded that the plain language of "the statute at issue specifically focuses on a defendant's prior 'convictions' at the time of sentencing, and makes no distinction between convictions that arise from a multiple count complaint, or a separate complaint." *Vasquez*, 753 A.2d at 809; *id.* at 811 (explaining that "[t]he statute could not be clearer that the sentencing judge looks back only from the time of sentencing to determine if there is a previous conviction that can be used to enhance the offender's sentence."). The Supreme Court determined that because no ambiguity existed, it could not interpret the words of the statute to require that the two offenses be separated by an intervening arrest and conviction. *Id.* at 809–11.[1]

¶ 18 Similar to the *Vasquez* Court's interpretation of section 7508, section 9715 only requires the trial court to determine, **at the time of sentencing,** whether the defendant previously has been convicted of murder or voluntary manslaughter at any time, and whether this initial conviction may be used to enhance the sentence on the second conviction. The legislature did not include a requirement in section 9715 that the previous conviction must antedate the commission of the second offense for which a defendant is being sentenced or that the crimes must have been tried and sentenced separately. *See Drummond,* 775 A.2d at 856 (explaining that appellate courts may not insert additional requirements into a statute where the legislature has not included such provisions). We note that if the legislature intended such a result, it would have inserted such language in the statute. *See, e.g.,* 42 Pa. C.S.A. § 9711(d)(10), (11), (12) (stating that "the defendant has been convicted of another [offense] committed either before or at the time of the offense at issue."). Accordingly, based upon the clear language of section 9715, we conclude that the trial court did not commit legal error in using Morris's first conviction for Robert Isaiah's murder to enhance the sentence for Morris's conviction for Jhayden's murder, even though the two murders were tried and sentenced together.

¶ 19 Based upon our above reasoning, we overrule the three-judge panel decision of this Court in *Commonwealth v. Smith,* 710 A.2d 1179 (Pa.Super.1998), *appeal denied,* 558 Pa. 618, 737 A.2d 742 (Pa.1999).[2] In *Smith,* the defendant was

---

1. We note that Morris attempts to argue that our Court's decision in *Vasquez* supports his argument. However, the Superior Court's decision was overturned by the Supreme Court of Pennsylvania. It is well-settled that if the Supreme Court overturns this Court's ruling, this Court's decision is no longer binding precedent and the Supreme Court's ruling becomes binding precedent. *See Commonwealth v. Tilghman,* 543 Pa. 578, 673 A.2d 898, 903 (1996) (stating that "[i]f a majority of the Justices of this Court, after reviewing an appeal before us (taken either by way of direct appeal or grant of allowance of appeal),

join in issuing an opinion, our opinion becomes binding precedent on the courts of this Commonwealth. Our majority opinion is binding not only on the parties before us, under the doctrine of law of the case, but is precedent as to different parties in cases involving substantially similar facts, pursuant to the rule of *stare decisis.*") (citation and footnote omitted).

2. It is well-settled that this Court, sitting *en banc,* may overrule the decision of a three-judge panel of this Court. *See Commonwealth*

convicted of two counts of third-degree murder after he opened fire on a group of men during a dispute. *Smith*, 710 A.2d at 1180. In sentencing the defendant, the trial court did not apply section 9715, and a panel of this Court affirmed. *Id.* at 1181. The panel concluded that section 9715 was not implicated because the defendant "was found guilty at the same time and by the same jury of two counts of third degree murder arising out of the same incident." *Id.* The panel reasoned that the two convictions were essentially simultaneous and that section 9715 could not be interpreted to encompass this circumstance. *Id.* ("We believe it strains the plain meaning of the statute to interpret 'previously convicted' to encompass this situation.").

■■■ ¶ 20 The *Smith* Court essentially read new requirements into the statutory language. Section 9715 specifically focuses upon whether, at the time of sentencing, a defendant has been previously convicted "at any time." The statute does not state that the two murders must be tried and sentenced separately. Indeed, the plain language of the statute requires that the trial court determine whether a previous conviction exists at the time of sentencing, without giving consideration to when the conviction occurred. Further, the statute does not make any distinction between convictions that arise from a single criminal episode and multiple criminal episodes. We are bound by the unambiguous language of this statute and we cannot insert additional requirements that the legislature has not included. *See Drummond, supra.* Accordingly, because the *Smith* Court's decision read requirements into

the statute that plainly do not appear, we conclude that its reasoning is flawed and that the decision must be overruled.

¶ 21 Morris also argues that this Court's decision in *Commonwealth v. Wolfe*, 349 Pa.Super. 415, 503 A.2d 435, 439 (1986),[3] demonstrates that the conviction and sentencing on the primary conviction must antedate the commission of the second offense. The *Wolfe* Court interpreted the sentencing guidelines in determining whether the imposition of a higher sentence on a recidivist was proper. *Id.* at 437–38. However, Morris does not indicate how this decision implicates section 9715. Indeed, unlike the situation in *Wolfe* wherein the Court utilized the recidivist philosophy of sentencing, section 9715 applies a mechanical approach, which renders the statute applicable at the time of sentencing. Our Supreme Court has noted the following:

> The recidivist philosophy, while a valid policy, is not the only valid sentencing policy, nor is it a constitutional principle or mandate: "the legislature is therefore free to reject or replace it when enacting recidivist sentencing legislation. If the legislature enacts a statute which clearly expresses a different application, the 'recidivist philosophy' possesses no authority which would override clearly contrary statutory language."

*Commonwealth v. Bradley*, 575 Pa. 141, 834 A.2d 1127, 1135 (2003) (quoting *Commonwealth v. Williams*, 539 Pa. 249, 652 A.2d 283, 285 (1994)); *Vasquez*, 753 A.2d at 811 (Cappy, C.J., concurring) (stating that the legislature is free "to enact sentencing schemes that reflect penal philosophies other than the recidivist philoso-

---

v. *Jacobs*, 900 A.2d 368, 377 n. 9 (Pa.Super.2006) (*en banc*).

**3.** We note that our Court's decision and reasoning in *Wolfe* was superseded by the legisla-

ture's amendment to a statute to include a definition of "previously convicted." *See Commonwealth v. Eyster*, 401 Pa.Super. 477, 585 A.2d 1027, 1030–32 (1991) (*en banc*).

phy[,]" such as in section 7508, which is implicated at sentencing). As noted in the text of the statute, section 9715 is applicable notwithstanding provisions of section 9712, 9713, or 9714, and must be applied at the time of sentencing, as clearly stated by the legislature. *See Gonzales,* 609 A.2d at 1373 (stating that section 9715 is operative notwithstanding other recidivist statutes). Based upon the foregoing, we conclude that Morris's third claim is without merit.

¶ 22 Judgment of sentence affirmed.