2025 PA Super 221

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JENNIFER TRAVINSKI | : | |
| | : | |
| Appellant | : | No. 1029 MDA 2024 |

Appeal from the Judgment of Sentence Entered March 25, 2024
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0000503-2023

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                **FILED: OCTOBER 1, 2025**

Appellant, Jennifer Travinski, appeals from the judgment of sentence entered in the Court of Common Pleas of Luzerne County after a jury convicted her of third-degree murder and aggravated assault.   After careful consideration, we affirm.

The present matter stems from Appellant's role in the fentanyl-related death of her 16-day-old daughter.   At trial, the Commonwealth sought to prove that Appellant was a substantial, proximate cause of her baby's death through acts displaying a conscious disregard for an extremely high risk that fentanyl use and possession by her and her husband could cause death or serious bodily harm to the baby.

To prove both the malice and causation elements to the charges filed, the Commonwealth presented evidence that Appellant was using heroin and

_____

[*] Former Justice specially assigned to the Superior Court.

fentanyl throughout the time before and after A.T.'s birth, did so despite receiving medical advice on the dangers of exposing her child to these illegal drugs, and brought her newborn to a home where both she and her husband were active users who commingled their drug habits with their childcare activities. The Commonwealth's proffer began with evidence that Appellant was using heroin and fentanyl when she was six months' pregnant with A.T. Appellant's adult daughter, 22 year-old Abigail Pero, and Michael Nogan, an emergency room physician's assistant, each testified about Appellant's visit to the emergency room at Beebe Hospital in Lewes, Delaware, on August 4, 2021, while she was on vacation.

Ms. Pero testified that she and her mother, Appellant, took a weekend vacation to Rehoboth Beach, Delaware as part of a larger schedule of events to celebrate the upcoming birth of Appellant's baby. While there, however, Appellant was frequently tired, nauseous, and complaining about feeling sick. N.T. at 45-47. On their second night of vacation, Appellant left dinner early to return to the hotel room, while Ms. Pero remained at the restaurant.

Ms. Pero returned to the room to find Appellant asleep in bed, so she retired, too. Hours later, she was awakened by Appellant's screaming and moaning, and she suggested they go to the hospital. N.T. at 48. Appellant resisted at first but reluctantly agreed. N.T. at 47-48.

Pero suspected Appellant's conduct was attributable to drug use, as she had been concerned about a relapse during pregnancy, but she testified that she discovered no drug paraphernalia or other physical evidence of drug use

- 2 -

in the hotel room they shared. N.T. at 66-67. Nevertheless, her mother's unusual behavior in the hotel room and combativeness with nurses at the hospital heightened her suspicion that Appellant was under the influence of drugs. N.T. at 60.[1]

P.A. Nogan, who makes diagnoses as part of his emergency room duties, concluded his examination of Appellant by diagnosing her with opioid withdrawal. N.T. at 86-89. Supporting this diagnosis, he maintained, were Appellant's admission of having used heroin on the previous day,[2] his observation of needle tracks on her arm, and the results of her toxicology panel that showed a "presumptive positive" result for fentanyl despite her having no prescription for the narcotic. N.T. at 79-83. Consistent with Appellant's self-reported history and lab results were her initially argumentative, uncooperative, and emotional presentation to Nogan and the medical staff. *Id*. Eventually, Appellant checked herself out against medical advice, but not before health care professionals advised her of the drug use-associated health risks to her and her fetus.

Approximately three months later, on November 11, 2021, Appellant gave birth to her daughter, A.T. Before Appellant's discharge from Geisinger

---

[1] Because Pero is a student teacher and, thus, a mandated reporter, she filed a ChildLine report recounting the event and conveying her suspicions of Appellant's drug use while pregnant. N.T. at 61-62. She filed the report four days after A.T.'s birth. N.T. at 62.

[2] P.A. Nogan initially interviewed Appellant's daughter, who stated her belief that Appellant had not used heroin since June, but Appellant informed him that she used a bag of heroin the day before. N.T. at 79.

Hospital's Maternal Child Unit, she received lactation consultation. N.T. at 101. According to from Jill Martin, Director of Lactation Services at Geisinger, a lactation consultant would have advised Appellant against breastfeeding if she were using illegal drugs and provided her with related educational materials for home reading and reference. N.T. at 113-115.

On November 22, 2021, Luzerne County Children and Youth received the ChildLine report of Appellant's suspected drug use filed by Abigail Pero, and followed up by assigning a caseworker to meet with Appellant and her husband and ask them to submit to drug testing, which they did. Appellant's results were received on November 29, 2021, and showed she tested positive for fentanyl and norfentanyl. N.T. at 212-13.

Two days before Appellant's drug results were obtained, however, her 16-day old daughter died from fentanyl-related pneumonia. The facts of her death and the ensuing investigation are aptly summarized in the trial court's Pa.R.A.P. 1925(a) opinion:

> On November 27, 2021, Patrolman Baily Conforti of the Larksville Police Department responded to a call that a baby was having difficulty breathing. Patrolman Conforti hurried toward [Appellant's residence, where she and] Officer Robert Bartolemi were the first emergency responders to arrive. N.T. (trial), 12/4/2023, at 138-140. As the officers entered the residence, [husband] Gary Travinski was attempting CPR; seeing child was unresponsive, Patrolman Conforti began to perform CPR on the child while the medic unit was in route. N.T. at 141. Plains ALS medic unit and Larksville EMS arrived at the scene where they provided emergency care and transported the child to Geisinger South Wilkes-Barre. N.T. at 144.

The following day, the Lehigh Valley Coroner contacted the Pennsylvania State Police to report the child's suspicious death. An Autopsy was performed on the child and her blood tested positive for fentanyl. N.T. at 240-243. The autopsy determined that the cause of A.T.'s death was adverse effects of fentanyl exposure complicating acute pneumonia. A law enforcement investigation into the death resulted in police learning that the infant was fed with a bottle of Similac formula mixed with breast milk.

A search of the Travinski residence resulted in police finding small glassine baggies containing residue of a powdered substance marked "white castle," "band aid," and "hipster." N.T. at 175, 177, 180. Dozens of these items and other suspected drug paraphernalia located in the Travinski residence were taken into evidence. N.T. at 165-180. The powder in the glassine bags was tested and determined to be fentanyl. N.T. at 203-06, Cmwlth exhibit 14. Feeding bottles, apparently prepared for A.T. prior to her death, were also removed from the home pursuant to a search warrant. N.T. at 171-72.

Trial Court Opinion, 10/4/24, at 1-2.

Appellant raises one issue for this Court's consideration:

Did the Commonwealth fail to prove, beyond a reasonable doubt, that the Defendant was the cause or a substantial contributing factor to the death of A.T., such that she is guilty of third degree murder under 18 Pa.C.S.A. § 2502(c) and aggravated assault under 18 Pa.C.S.A. § 2702(a)(9)?

Brief for Appellant, at 2.

Appellant's sufficiency of the evidence claim addresses the element of causation and presents the argument that, because husband was just as likely as she to be the source of A.T.'s fentanyl exposure, the Commonwealth failed to prove she was the cause of or a substantial contributing factor to A.T.'s death. Brief of Appellant at 2. We disagree.

Appellate review of a challenge to the sufficiency of the evidence is governed by the following principles:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa. Super. 2005) (quoting

*Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa. Super. 2003)).

Appellant was convicted of aggravated assault[3] and third-degree

murder,[4] the latter of which is defined as "all other kinds of murder," *i.e.*,

---

[3] Under 18 Pa.C.S.A. 2702(a)(9), a person commits aggravated assault of a child less than 13 years of age if the person "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older."

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

***Commonwealth v. Widger***, 237 A.3d 1151, 1157 (Pa. Super. 2020) at § 302(b)(3).

[4] The Crimes Code defines criminal homicide and murder, as follows:

**§ 2501. Criminal Homicide**

**(a) Offense defined.**—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.
18 Pa.C.S.A. § 2501(a).

**§ 2502. Murder**

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

**(b) Murder of the second degree.--**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

*(Footnote Continued Next Page)*

"when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." ***Commonwealth v. Morris***, 958 A.2d 569, 576 (Pa. Super. 2008); ***see also*** 18 Pa.C.S.A. § 2502(c). For these purposes, "[m]alice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." ***Id***.

As a general matter, "it is undisputed that causation constitutes an essential element of the offense of murder which the Commonwealth must prove beyond a reasonable doubt." ***Commonwealth v. Rementer***, 598 A.2d 1300, 1304 (Pa. Super. 1991). The Pennsylvania Rules of Criminal Procedure have defined the requirement of causation as follows:

> **(a) General rule.**--Conduct is the cause of a result when:
>
> (1) it is an antecedent but for which the result in question would not have occurred; and
>
> (2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

Pa.R.Crim.P. 303(a).

Our Court has interpreted the two-part test with respect to causation, as follows:

---

> **(c) Murder of the third degree.--**All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa. Stat. and Cons. Stat. Ann. § 2502.

First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. A victim's death cannot be entirely attributable to other factors; rather, there must exist a causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place. Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible.

*Commonwealth v. Spotti*, 94 A.3d 367, 375 (Pa. Super. 2014) (cleaned up).

Moreover, as to the first part of the test, we have observed:

the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. *Rementer*, 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." *Long*, 624 A.2d at 203 (*citing* *Commonwealth v. Skufca*, 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed*, 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. *Id. (citing* *Rementer* and *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." *Id.* at 204, 624 A.2d 200 (*citing* *Rementer*, 598 A.2d at 1306–1307).

*Commonwealth v. Nunn*, 947 A.2d 756, 760 (Pa. Super. 2008).

Viewing the evidence in a light most favorable to the Commonwealth as verdict winner, we conclude the Commonwealth proved causation with evidence establishing that but for Appellant's knowing and reckless disregard for the obvious and counselor-described dangers to her child that fentanyl and opioid exposure posed, A.T. would not have died from fentanyl-related acute

pneumonia. Specifically, the jury learned the details of how Appellant knowingly and recklessly, exposed A.T. to fentanyl. Whether by her own drug use and transmission to A.T. through breastmilk—either pumped/bottled[5] or directly breastfed—or by her and her husband's handling of powdered fentanyl and the hundreds of residue-covered glassine baggies found in the same space where they prepared baby bottles and fed and changed their newborn,[6]

_____

[5] While the criminal investigation included a toxicology analysis of four prepared baby bottles recovered from Appellant's home refrigerator, it did not identify whether the bottles contained breast milk, formula, or a combination of the two. *See* N.T. 221. At trial, the Commonwealth presented circumstantial evidence that Appellant was feeding the baby her breastmilk through the testimony of Lehigh County Deputy Coroner Jackie Seidman, who met Appellant and husband at the hospital on the morning of November 28, 2021, and explained to them that she was there to interview them and to accompany them back to their home to do a reenactment of events as part of her task to determine the exact cause and manner of their child's death. N.T. at 261-262. According to Seidman, she was aware through either the interview or her review of medical records that Appellant had consulted with the lactation support team before the birth of A.T. and indicated the newborn feeding plan would be exclusively breastfeeding. N.T. at 277. After A.T.'s birth, a "breast and formula" feeding schedule was started, N.T. at 277, and Geisinger hospital records confirmed the feeding plan for the baby would consist of breast milk combined with formula supplementation. N.T. at 278. Also notable among the hospital's lactation consultation records was Appellant's denial of any illicit drug use over the last 17 years. N.T. 276-77. Seidman testified that Appellant repeated this denial during the coroner's interview. N.T. at 261.

[6] Evidence in this regard included testimony that a search of Appellant's home disclosed 68 empty fentanyl glassine baggies discarded in a soiled diaper disposal device called a "diaper genie" located in the room used as the nursery. N.T. at 172, 174-75. One soiled diaper contained several baggies wrapped with a rubber band, more were found elsewhere in the diaper genie, and five more were recovered from a trash bag hanging from the nursery dresser. N.T. at 168. All told, in addition to the many unused fentanyl packets discovered, over 200 empty baggies bearing fentanyl residue were found throughout the home. *See* N.T. 169-205.

evidence supported the jury's reasonable inference that Appellant willingly participated in a household routine that regularly commingled childcare undertakings with fentanyl use and possession despite knowing the serious health and safety risks associated with exposing a baby to fentanyl.

In **_Commonwealth v. Wright_**, 237 A.3d 426 (non-precedential decision) (Pa. Super. filed May 11, 2020),[7] this Court upheld Defendant Wright's third-degree murder conviction for his failure to fulfill his affirmative duty to care for his 23 month-old daughter, who died from significant and sustained malnutrition. At trial, testimony established that Wright repeatedly refused to care for his daughter and demanded, instead, that the girl's mother, with whom Wright lived, essentially assume sole responsibility for the child.

On appeal, in addressing Wright's challenge to the sufficiency of the evidence offered to prove the mental state of malice necessary to third degree murder, the three-judge panel implicitly rejected Wright's would-be division of labor defense offered to contest the elements of intent and causation. The court declared that where parents reside with their children and are capable of rendering care, they have an affirmative duty to care for their children who cannot care for themselves, and because Wright's child clearly could not care for herself, "the failure of [Wright] and [the child's mother] to provide care was the cause of her death." **_Wright_**, 237 at *4.

_____

[7] Under Pa.R.A.P. 126(b), we may cite and rely on non-precedential decisions filed after May 1, 2019, for their persuasive value.

- 11 -

In making this declaration, *Wright* relied on *Commonwealth v. Smith*, 567 A.2d 1070 (Pa. Super. 1989), in which this Court held that evidence was sufficient to support a third-degree murder conviction of a mother who caused her three-year-old child to die of malnutrition from a one-meal-per-day diet. The *Smith* Court observed, "[a] custodial parent has a duty to care for a three year old child, and failure to provide care can be the cause of death when a three year old child dies of malnutrition." *Id.* at 1072.

Because the case *sub judice* falls squarely under the decisional law handed down in *Smith* and relied upon by *Wright*, we reject Appellant's argument that the Commonwealth failed to prove beyond a reasonable doubt that Appellant was a substantial and proximate cause of A.T.'s death. Both she and her husband were custodian parents of A.T., and from her recent hospital consult she knew or should have known that her fentanyl use and their possession of numerous fentanyl baggies throughout their home created an inherently dangerous feeding and living environment for their child. As in *Wright* and *Smith*, where we acknowledged that an affirmative child caretaking duty applies to both able parents residing with children who cannot care for themselves, Appellant bears responsibility as a parent who caused A.T.'s direct exposure to known or obvious fentanyl sources. Therefore, whether the jury reasonably inferred that she directly introduced fentanyl through her breastmilk consistent with her stated intent to breastfeed her newborn or that she contributed to the environmental conditions that

represented a separate potential source of fentanyl exposure, her causation of A.T.'s death was proven beyond a reasonable doubt.

Therefore, we find that the Commonwealth's evidence permitted the jury to conclude that A.T.'s death was not "entirely attributable to other factors" but was, instead, caused by the natural and foreseeable consequence of Appellant's decision to conflate the activities of her drug habit with those of rearing her newborn baby. Accordingly, we affirm judgment of sentence.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/1/2025