**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Stevenson Leon ROSE, Appellant.**

Superior Court of Pennsylvania.

Argued April 30, 2013.

Filed Nov. 25, 2013.

William C. Kaczynski, Pittsburgh, for appellant.

Daniel E. Fitzsimmons, Assistant District Attorney and Keaton Carr, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: STEVENS, P.J.,*
BENDER, BOWES, GANTMAN, DONOHUE, ALLEN, OLSON, OTT, and WECHT, JJ.

OPINION BY BOWES, J.:

Stevenson Leon Rose appeals from the judgment of sentence of twenty to forty years incarceration imposed by the trial court after a jury convicted him of third degree murder. After considerable review, we vacate and remand for re-sentencing.

Appellant and Shawn Sadik brutally attacked Mary Mitchell in the early morning hours on July 13, 1993, in Larimer Park in the East Liberty section of Pittsburgh. During the attack, the victim was kicked in her head approximately sixty times, forty to fifty times by Appellant, and her throat was nearly severed. In addition, a sixteen-inch piece of aluminum framing was inserted into her vagina, causing serious internal bleeding. Appellant and Mr. Sadik left the victim naked and bleeding. Ms. Mitchell was initially found in Larimer Park by two drug addicts, James Migliore and Thomas Solomon. Initially, one of the men believed Ms. Mitchell was dead; however, when they discovered that she was alive, they moved her to a sidewalk and attempted to get help by knocking on surrounding neighborhood doors. Unsuccessful in these attempts, the two men telephoned police from a pay phone and awaited their arrival.

The police investigation led to Appellant and Mr. Sadik. Bloody clothing and shoes were recovered from Appellant's residence in the afternoon of July 13, 1993. After waiving his *Miranda* rights, Appellant provided police with a statement, which was recorded. In that statement, Appellant admitted that he and Mr. Sadik had been drinking and had attacked the victim by kicking and stomping her. He denied stabbing the victim.

The attack left Ms. Mitchell in a vegetative state; however, Ms. Mitchell did not succumb to her injuries until September 17, 2007. The Commonwealth initially tried Appellant for attempted murder, aggravated assault, involuntary sexual deviate intercourse, and recklessly endangering another person. A jury convicted Appellant of these crimes and, on March 16, 1994, the court sentenced Appellant to fifteen to thirty years imprisonment. This Court affirmed and our Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Rose*, 445 Pa.Super. 630, 664 A.2d 1059 (1995) (unpublished memorandum), *appeal denied*, 543 Pa. 712, 672 A.2d 306 (1995).

Following the death of the victim, Appellant and Mr. Sadik were charged with criminal homicide on October 9, 2007. The two men were tried separately. Appellant asserted a diminished capacity defense based on his high level of intoxication. The defense offered evidence that, within twenty four hours of the attack, Appellant had consumed four twelve ounce beers, a forty ounce beer, three shots of gin, three shots of vodka, one-and-a-half quarts of wine, a gram of cocaine, and smoked two marijuana cigarettes. Appellant presented expert testimony that his blood alcohol level at the time of the attack was .40 and

* President Judge Stevens did not participate in    the consideration or decision of this case.

that he lacked the ability to formulate a specific intent to kill.

Ultimately, on October 13, 2010, the jury convicted Appellant of third-degree murder. At sentencing, Appellant maintained that when he assaulted the victim, the applicable sentence for third-degree murder was ten to twenty years, and, therefore, he could only be sentenced to that term of incarceration. The Commonwealth countered that because the murder was not complete until after the victim died, the current twenty to forty year maximum was applicable. *See* 18 Pa.C.S. § 1102(d).[1] The sentencing court agreed with the Commonwealth and this timely appeal ensued.

■ The court directed Appellant to file and serve a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant complied, and the trial court authored a Pa.R.A.P. 1925(a) decision. A panel of this Court initially vacated Appellant's sentence in a published decision, and the Commonwealth sought *en banc* review. This Court granted *en banc* reargument. The matter is now ready for our review. Appellant presents two interrelated issues for this Court's consideration.

I. Whether the trial court's retroactive application of an after-enacted sentencing statute is prohibited by the express terms of 1 Pa.C.S.A. § 1926, which forbids retroactivity absent a clear and manifest intent by the General Assembly. And whether the trial court erred in retroactively applying the statute to conduct and acts which had been completed long before enactment of the statute.

II. Whether the sentencing court's retroactive application of 18 Pa.S.C.A. [sic] § 1102(d) to the Appellant's circumstances increased the punishment for criminal acts long after they had been committed, thereby violating the *Ex Post Facto* and Due Process Clauses of the Pennsylvania and United States Constitutions.[2]

Appellant's brief at 4.

■ Appellant's retroactivity, *ex post facto* and due process positions are largely intertwined since retroactivity is integral to both whether an *ex post facto* and/or a due process violation occurred.[3] Further, Appellant and the Commonwealth intermingle their retroactivity arguments with a discussion of *ex post facto* law. As we find Appellant's *ex post facto* argument dispositive, we proceed to that analysis.

Appellant's constitutional challenge is an as-applied attack on § 1102(d), in contrast to a facial challenge. This Court has explained the difference, stating,

---

1. 18 Pa.C.S. § 1102(d) reads:
   **(d) Third degree.**—Notwithstanding section 1103, a person who has been convicted of murder of the third degree or of third degree murder of an unborn child shall be sentenced to a term which shall be fixed by the court at not more than 40 years.

2. The term "due process" does not appear in the Pennsylvania Constitution; however, the phrase "law of the land," contained within Article I, § 9, is considered synonymous with that term. *See Craig v. Kline*, 65 Pa. 399, 413 (1870); *Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 276, 18 How. 272, 15 L.Ed. 372 (1855); *Commonwealth v. Harrell*, 65 A.3d 420, 448 n. 10 (Pa.Super.2013) (Donohue, J. dissenting).

3. Since this case does not involve application of a judicial precedent interpreting a statute or judicial abrogation of the common law, this case is more properly framed as an *ex post facto* challenge and not a due process issue. *See Metrish v. Lancaster*, —— U.S. ——, 133 S.Ct. 1781, 185 L.Ed.2d 988 (2013) (discussing difference between *ex post facto* violation and related due process challenge).

A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. . . .

*Commonwealth v. Brown,* 26 A.3d 485, 493 (Pa.Super.2011).

■ Article I, Section 17 of the Pennsylvania Constitution is Pennsylvania's *ex post facto* clause. The prohibition against *ex post facto* laws has been part of Pennsylvania's Constitution since 1790. The clause reads, "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. Art. I, § 17. Similarly, the federal constitution provides that "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the obligation of contracts. . . ." U.S. Const. Article I, § 10.[4] Our Supreme Court has opined that the "same pre-revolutionary-war concerns shaped the ex post facto provision of the constitutions of Pennsylvania and the United States." *Commonwealth v. Gaffney,* 557 Pa. 327, 733 A.2d 616, 621 (1999). Accordingly, "the standards applied to determine an ex post facto violation under the Pennsylvania Constitution and the United States Constitution are comparable." *Commonwealth v. Young,* 536 Pa. 57, 637 A.2d 1313, 1317 n. 7 (1993); *Commonwealth v. Allshouse,* 614 Pa. 229, 36 A.3d 163, 184 (2012) (citing *Young, supra* ).

■ In interpreting the Pennsylvania Constitution, "great regard should be paid to *spirit* and *intention* " and it is impor-

tant to examine the "probable intent of the makers." *Farmers' & Mechanics' Bank v. Smith,* 1817 WL 1771, 5 (Pa.1817), *reversed on other grounds at* 19 U.S. 131, 6 Wheat. 131, 5 L.Ed. 224 (1821) (emphases in original); *Firing v. Kephart,* 466 Pa. 560, 353 A.2d 833, 835–836 (1976). As the eminent Chief Justice John Bannister Gibson stated,

A constitution is made, not particularly for the inspection of lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties; and it is consequently expressed in the terms that are most familiar to them. Words, therefore, which do not of themselves denote that they are used in a technical sense, are to have their plain, popular, obvious, and natural meaning[.]

*Monongahela Nav. Co. v. Coons,* 6 Watts and Serg. 101, 114 (Pa.1843). Concomitantly, a fundamental precept in interpreting our constitution is that the language "must be interpreted in its popular sense, as understood by the people when they voted on its adoption. Our ultimate touchstone is the actual language of the Constitution itself." *Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918, 939 (2006) (citations omitted).

■ Simply put, under long standing and established principles, we are required to examine the original public meaning of the text at issue, giving due regard to both its spirit and the intent of the framers of the clause. The text itself of the Pennsylvania and United States Constitution is largely unilluminating. As Justice Chase opined with regard to the federal provision, "naked and without explanation, it is unintelligible, and means nothing." *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798).

4. Article I, § 9 of the federal constitution similarly prohibits Congress from passing an *ex* *post facto* law, stating, "No Bill of Attainder or ex post facto Law shall be passed."

In *Calder*, the United States Supreme Court first discussed the federal constitutional prohibition against *ex post facto* laws. Justice Chase noted that the phrase "*ex post facto* laws" was technical in nature and "had been in use long before the Revolution, and had acquired an appropriate meaning." *Id.* at 389; *see also Peugh v. United States*, ⎯ U.S. ⎯, ⎯, 133 S.Ct. 2072, 2081, 186 L.Ed.2d 84 (2013) (citing *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) and stating, "The phrase 'ex post facto' was a term of art with an established meaning at the time of the framing."). According to the *Calder* Court, the prohibition against *ex post facto* laws applied only to criminal law. Relying heavily on English common law scholar Richard Wooddeson's treatise,[5] Justice Chase set forth four specific types of laws that would violate the federal constitution's bar against *ex post facto* laws.

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.2d. Every law that aggravates a crime, or makes it greater than it was, when committed.3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when com-

mitted. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Id.* at 390.[6] Instantly, we are concerned with the third category: a law that increases the punishment of a crime from what the law provided when the crime was committed. "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). Further, in order for a penal provision to violate the *ex post facto* clauses, it must be "more onerous than the law in effect on the date of the offense." *Id.; see also id.* at 32 n. 17, 101 S.Ct. 960 ("The critical question. . . . is whether the new provision imposes greater punishment after the commission of the offense, not merely whether it increases a criminal sentence"); *Id.* at 37 n. 22, 101 S.Ct. 960 ("The proper relief upon a conclusion that a state prisoner is being treated under an *ex post facto* law is to remand to permit

5. Richard Wooddeson was William Blackstone's successor. *See Carmell v. Texas*, 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). Wooddeson's treatise was published in 1792, after the passage of both the Pennsylvania and federal constitutions. *Id.* at 523, 120 S.Ct. 1620.

6. Early United States treatises on the federal constitution, by Justice Joseph Story and Chancellor James Kent, defined *ex post facto* laws similarly. *Carmell v. Texas*, 529 U.S. 513, 524–525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (citing 3 Commentaries on the Constitution of the United States § 1339, p. 212 (1833) and 1 Commentaries on American Law 408 (3d ed. 1836)). However, Blackstone's own definition of *ex post facto* laws

was limited to the first two categories set forth by Justice Chase. Further, the early state constitutions did not mention either the third or fourth category. *Id.* at 526, 120 S.Ct. 1620 ("neither Blackstone nor the state constitutions mention *Calder*'s third category"). As Justice Thomas has aptly stated, "Although Blackstone confined his discussion of *ex post facto* laws to those laws retroactively declaring innocent acts to be criminal, other authorities confirm that laws retroactively increasing the punishment were also understood to be *ex post facto* at the time of the founding." *Peugh v. United States*, ⎯ U.S. ⎯, 133 S.Ct. 2072, 2094, 186 L.Ed.2d 84 (2013) (Thomas, J. dissenting).

the state court to apply, if possible, the law in place when his crime occurred.").

■■■■ The *Weaver* Court, however, also opined that "any law 'which imposes a punishment for an **act** which was not punishable at the time it was committed;' or imposes additional punishment to that then prescribed[,]" is an *ex post facto* violation. *Id.* at 28, 101 S.Ct. 960 (emphasis added). Similarly, the Court reasoned that when performing an *ex post facto* analysis a court "is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the **act** occurred." *Id.* at 31 n. 13, 101 S.Ct. 960 (emphases added).

Neither the framers nor the ratifiers of the Pennsylvania or federal constitution contemplated application of the *ex post facto* law to the factual situation herein. First, under the common law existing at the time of the passage of the respective constitutions, a person could not be convicted of murder unless the victim died within a year-and-a-day of the actions that ultimately resulted in the person's death. *See Commonwealth v. Ladd,* 402 Pa. 164, 166 A.2d 501 (1960); *see also Ladd, supra* (Musmanno, J. dissenting).

Presumably, of course, the legislature could have increased the punishment for murder in the year between when a victim was attacked and died. However, again, at the time of the ratification of both the federal and Pennsylvania Constitution, murder had yet to be divided into degrees

of murder and the crime of murder was subject to capital punishment. *See White v. Commonwealth,* 6 Binn. 179 (1813) (discussing change in law in 1794 relating to murder); *Commonwealth v. Carbone,* 375 Pa.Super. 261, 544 A.2d 462, 466 n. 1 (1988) *reversed on other grounds at* 524 Pa. 551, 574 A.2d 584 (1990); *see also Woodson v. North Carolina,* 428 U.S. 280, 289, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality) (discussing early history of common law murder, including Pennsylvania's adoption of degrees of murder).[7] Certainly, it would have been impossible to increase the maximum punishment at law beyond death. Indeed, Pennsylvania was the first state to divide murder into degrees, which subjected a person to a lesser punishment than death for murder. *See Carbone, supra; Woodson, supra.* Thus, at the time of the ratification of the respective *ex post facto* clauses, the only direction for the punishment of murder to move was downward.

Nonetheless, it is axiomatic that the ratifiers of a constitution cannot consider all possible scenarios in which the text of a constitution will apply and although there is considerable jurisprudence and discussion of *Calder*'s first two categories, no Pennsylvania case has addressed an analogous issue to the one presented here. As noted *supra* at footnote 6, other state constitutional *ex post facto* provisions explicitly mentioned only the first two aspects of Justice Chase's definition,[8] but it is well

---

**7.** From 1682 until 1718, colonial Pennsylvania only provided capital punishment for those convicted of willful and premeditated murder. *Commonwealth v. Wade,* 33 A.3d 108, 119 n. 9 (Pa.Super.2011).

**8.** The Massachusetts Constitution then provided, "Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent

with the fundamental principles of a free government." *Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 391, 1 L.Ed. 648 (1798) (citing Constitution of Massachusetts, Pt. I. Art. 24 (1780)).

Maryland and North Carolina's Constitutions contained identical provisions that stated, "That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty;

settled that the *ex post facto* clause encompassed Justice Chase's third category. *See Calder supra*, at 397 (Paterson J.) ("The enhancement of a crime or penalty, seems to come within the same mischief as the creation of a crime or penalty."). Accordingly, we survey the discussion contained in our sister states on somewhat similar questions.

In *People v. Gill*, 6 Cal. 637 (Ca.1865), the defendant attacked the victim on March 22, 1856, and, in April of that year, California divided murder into first and second degree. The victim apparently died after the new act passed and the defendant was convicted of murder in the second degree. The punishment for first-degree murder remained death, whereas second degree murder subjected a person to a potential life sentence. The court, without discussion of any constitutional principles stated,

> The death must be made to relate back to the unlawful act which occasioned it, and as the party died in consequence of wounds received on a particular day, the day on which the act was committed, and not the one on which the result of the act was determined, is the day on which the murder is properly to be charged.

*Gill, supra* at 638. Thus, the court resolved the issue on the procedural grounds of the then-proper manner in which an indictment was to be handed down.

The Nebraska Supreme Court in *Debney v. State*, 45 Neb. 856, 64 N.W. 446 (1895), held that for purposes of jurisdiction, the crime of murder was committed where the wounds or blows were struck and not where death results. In *Debney*, the defendant shot his wife on July 4, 1893, in Nance County, Nebraska. His wife died on July 9, 1893, in Platte County, Nebraska. The court concluded that the indictment should lie in Nance County. In making this jurisdictional finding, the court did not discuss *ex post facto* law, but relied on a collection of cases, including *Gill, supra*. In doing so, the *Debney* Court declined to find that death was an element of murder, though it acknowledged that the crime of murder was not complete until a death occurs.

In *State v. Masino*, 216 La. 352, 43 So.2d 685 (1949), the Supreme Court of Louisiana held that the statutory creation of negligent homicide after the commission of the negligent acts, but before the death of the victims, resulted in a violation of the *ex post facto* clause of the federal and Louisiana Constitutions. In *Masino*, contractors negligently failed to encase gas pipes with concrete. As a result, gas leakage began to accumulate and subsequently caused an explosion, killing several people. At the time of the negligent omission, Louisiana did not have a negligent homicide statute; however, before the explosion occurred, the state passed legislation creating the crime. Although the Court discussed in cursory fashion the term *ex post facto*, it summarily concluded that "the crime is committed on the date on which the deed, the original act, is performed, and not on the date of the victim's death." *Id.* at 687.

Justice McCaleb penned a dissent, stating that the negligent acts were but one of the elements of the homicide. According to Justice McCaleb, "[o]bviously, since the crime could not be perpetrated unless

wherefore no ex post facto law ought to be made." *Id.* at 391–392 (citing Maryland Constitution, A Declaration of Rights, Art. 15 (1776) and North Carolina Constitution, A Declaration of Rights, Art. 24 (1776)). The

Delaware Constitution set forth, "That retrospective laws punishing offences committed before the existence of such laws, are oppressive and unjust, and ought not to be made." *Id.* at 392.

there was a killing of a human being, the offense was committed when the killing took place." *Id.* He continued, opining, "[t]he State is not attempting to punish defendants for their negligent act in failing to encase with concrete the gas pipes under the building; they are being prosecuted for the killing which subsequently resulted from the negligent act." *Id.* Justice McCaleb reasoned that cases finding a murder was committed on the date on which the mortal blow was struck were only to be applied for limited procedural purposes and not constitutional *ex post facto* analysis.

Most recently, in *State v. Detter*, 298 N.C. 604, 260 S.E.2d 567 (1979), the North Carolina Supreme Court was faced with determining whether imposition of the death penalty resulted in an *ex post facto* violation. Therein, the defendant killed her husband by poison. She poisoned her husband in January, February, and March of 1977. The victim died on June 9, 1977. The North Carolina death penalty statute had been deemed unconstitutional by the United States Supreme Court in 1976, and the new death penalty statute did not become effective until June 1, 1977. Thus, at the time the defendant poisoned her husband, she faced a penalty of life imprisonment, but when he died, the death penalty statute was in effect.

The *Detter* Court held

when it becomes necessary to choose between the time the fatal blow is struck or the time of death for some special purpose, such as accessory after the fact to murder or to determine if a certain punishment is barred by the Ex post facto clause, the choice should be dictated by the nature of the inquiry. Perkins, Criminal Law (2d ed. 1969). Therefore, our decision in *State v.*

*Williams, supra,* [229 N.C. 348, 49 S.E.2d 617 (1948)] in which we chose the time of death as the time the murder was committed for the purpose of deciding if defendant was an accessory after the fact to murder, is sound, although, for purposes of the prohibition against Ex post facto legislation, we hold that the date(s) of the murderous acts rather than the date of death is the date the murder was committed. The scant authority that exists on this question is in accord with our holding here. *People v. Gill,* 6 Cal. 637 (1856); *Debney v. State,* 45 Neb. 856, 64 N.W. 446 (1895); *Perkins, supra;* LaFave & Scott, Criminal Law s 12 (1972); 40 Am.Jur.2d Homicide s 3.

Therefore, for purposes of this decision and application of the prohibition against Ex post facto legislation, we hold that the date the murderous acts were performed is the date the murder was committed. All of the murderous acts here were committed before 1 June 1977 at a time when the maximum punishment for first degree murder was life imprisonment. Therefore, imposition of the sentence of death under G.S. 15A–2002 in this case violates the prohibition against imposition of an Ex post facto punishment and the sentence is therefore, vacated.

*Detter, supra* at 590.

We find these cases instructive, though not dispositive. The critical inquiry here is similar to the questions presented in the aforementioned cases. Specifically, the question before us is whether the acts and events that occurred in 1993 preclude imposition of a sentence based on a statute passed in 1995, where the victim did not die until 2007?[9] Appellant argues that the

---

9. Appellant also maintains that application of revised sentencing guidelines and not the sentencing guidelines in effect in 1993 was improper. Appellant did not make this allega-

*ex post facto* provisions of both the Pennsylvania and federal constitutions apply to acts and conduct. Since Appellant's acts and conduct were completed in 1993, he maintains that he could not be punished more harshly for those acts based on a statute that the legislature passed after the fact. According to Appellant, "[r]etroactively making the consequences of a given act more severe by increasing the punishment is a clear *ex post facto* violation." Appellant's brief at 30. Simply put, Appellant submits, for purposes of *ex post facto* analysis, that the murder was committed on the date he attacked the victim.

The Commonwealth's reply conjoins an *ex post facto* law discussion with the issue of retroactivity and opines that the concepts "are almost inseparable[.]" Commonwealth's brief at 29. The Commonwealth specifically counters that the third category listed in *Calder* requires the infliction of a greater punishment than when the crime was committed and that the murder was not committed until the victim died. Since the crime was not complete until after the passage of the sentencing statute at issue, it maintains that Appellant's claims must fail. The Commonwealth highlights that Appellant could not have been charged with homicide "until more than a decade after the penalty for third degree murder was increased." Commonwealth's brief at 19. It continues that the statutory change did not affect Appellant when it was made in 1995 and may not have ever applied to him if the victim did not pass away. Thus, it submits that application of the statute is neither vindictive nor arbitrary.

In addition, the Commonwealth contends that it is "dubious to suggest that appellant's right to conduct a cost/benefit analysis of his crime before beating his victim was violated where the jury found him guilty of killing someone with malice, that is, a 'recklessness of consequences, and mind regardless of social duty.'" Commonwealth's brief at 19 (quoting *Commonwealth v. Morris*, 958 A.2d 569, 576 (Pa.Super.2008)). The Commonwealth also suggests that the non-binding cases from our sister states indicating that a murder is committed when the original blows are struck "provide tenuous footing" to base this Commonwealth's *ex post facto* analysis. Commonwealth's brief at 25. In leveling this aspect of its position, it opines that those courts "have adopted a faintly pondered rule of law that ignores the true purpose of the *ex post facto* clause." *Id.*

The Commonwealth acknowledges that the courts, in discussing *ex post facto* law, have utilized the words acts or conduct, but contends that many of these cases are focusing on the first *Calder* category and "it would be illogical and grammatically incorrect to use 'crime' or 'criminal offense[.]'" *Id.* at 26. This is because an innocent act when done cannot be criminal. *See also, Calder, supra* at 392 (Justice Chase opining that the Delaware Constitution inaccurately used the term offense rather than facts or actions). As it relates to courts' usage of the term "act" in *Calder*'s third category cases, it notes that none of these cases involved crimes that were not complete when the act was committed. The Commonwealth highlights that the third *Calder* category specifically uses the word "crime" rather than "acts"

tion in his Pa.R.A.P. 1925(b) statement; therefore, the issue is waived. *But see Peugh v. United States*, —— U.S. ——, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013) (holding, where issue was preserved, that utilization of federal sentencing guidelines promulgated after the criminal acts were committed, which increased the applicable guideline ranges, was an *ex post facto* violation). Additionally, we add that the use of the sentencing guidelines does not implicate the legality of Appellant's sentence.

and focuses on when the crime is committed.

■■■■ We acknowledge that "[t]he crime of murder does not exist and cannot arise until a human being dies.... It is indisputable that until the death of the victim there is not and cannot be a murder." *Ladd, supra* at 510 n. 15 and n. 16 (Bell, J. concurring). Any suggestion that the murder herein was completed in 1993 is refuted by the fact that Appellant could not have been charged or convicted of murder at that time. Moreover, contrary to the Nebraska Supreme Court's finding in *Debney,* death is, by statute, an element of criminal homicide in Pennsylvania. In this respect, our state legislature has defined the elements of on offense. That definition provides:

"Element of an offense." Such conduct or such attendant circumstances or such **a result of conduct** as:

(1) **is included in the description of the forbidden conduct in the definition of the offense;**

(2) establishes the required kind of culpability;

(3) negatives an excuse or justification for such conduct;

(4) negatives a defense under the statute of limitation; or

(5) **establishes jurisdiction or venue.**

18 Pa.C.S. § 103 (emphases added).

The Pennsylvania General Assembly has set forth that "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. § 2501. In addition, our legislature has further divided homicide into murder and manslaughter, and defined the degrees of murder in the following manner.

(a) **Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

(b) **Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

(c) **Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502. With regards to jurisdiction and venue, Pennsylvania law states,

(a) **General rule.**—Except as otherwise provided in this section, a person may be convicted under the law of this Commonwealth of an offense committed by his own conduct or the conduct of another for which he is legally accountable if either:

(1) the conduct which is an element of the offense or **the result which is such an element occurs** within this Commonwealth;

. . . .

(c) **Homicide.**—When the offense is homicide or homicide of an unborn child, either **the death of the victim,** including an unborn child, or the bodily impact causing death constitutes a "result" within the meaning of paragraph (a)(1) of this section, and if the body of a homicide victim, including an unborn child, is found within this Commonwealth, it is presumed that such result occurred within this Commonwealth.

18 Pa.C.S. § 102 (emphases added).

■■■■ Death is included in the description of homicide and can confer jurisdiction or venue. Hence, the procedural and jurisdictional grounds discussed in both *Gill* and *Debney* for finding when a murder is committed are subject to different stan-

dards under Pennsylvania law. Since Pennsylvania law defines the crime of third degree murder by employing multiple elements, and it is the combination of those elements that constitutes the crime, not simply the harmful acts, murder is not consummated until the victim dies.[10]

With respect to the notice concern of the *ex post facto* clauses, the United States Supreme Court has recognized that, where *Calder*'s third category is implicated, "there are few, if any, reliance interests in planning future criminal activities based on the expectation of less severe repercussions." *Carmell v. Texas*, 529 U.S. 513, 531 n. 21, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). This is even more so where the crime is one that does not require specific intent or knowledge. Pointedly, we are cognizant that the issue of notice as it relates to *ex post facto* law is not particularly strong where the crime is not one requiring specific intent or knowledge because the person does not necessarily intend to commit the crime. Where the individual does not possess a specific intent to commit the crime, he cannot possibly be contemplating potential punishment for the crime. Therefore, notice of a particular punishment cannot dissuade the commission of the offense where there is no intent requirement for the crime. Phrased differently, the notice interest that the *ex post facto* clauses was intended to serve is weakest when the third *Calder* category is at issue and at its strongest when the first two categories are in question. Of course, "the absence of a reliance interest is not an argument in favor of

abandoning the category itself." *Id.* at 531 n. 21, 120 S.Ct. 1620.

Although we agree with the Commonwealth that the murder herein could not have been charged until the victim died and that the notice aspect of *ex post facto* analysis is not particularly pertinent, the issue in the instant case is whether the completed criminal acts of 1993 or the consummation of the crime with the death of the victim in 2007 triggers our *ex post facto* analysis. Based on the original meaning of the respective *ex post facto* clauses, we find the former.

Recently, the Supreme Court of the United States, in discussing the third *Calder* category, considered whether sentencing a defendant under federal sentencing guidelines promulgated after the defendant "committed his criminal acts" was sentenced *ex post facto* where the new guidelines created a higher guideline range than the version at the time he committed the offense. *Peugh, supra* at 2078. Although in *Peugh,* the defendant's criminal acts resulted in simultaneous consummation of the criminal offense, unlike what occurred here, it is evident that courts have focused on the time of the completion of the acts. Justice Story in his famous *Commentaries on the Constitution of the United States* opined that *ex post facto* laws were laws "whereby the act, if a crime, is aggravated in enormity, or punishment[.]" *Peugh, supra* at 2094 (Thomas, J. dissenting) (citing 3 J. Story, *Commentaries on the Constitution of the United States* § 679, p. 486 (Abr. 1833)).[11]

10. In the jury trial right arena, the United States Supreme Court has held that "If a fact was by law essential to the penalty, it was an element of the offense." *Alleyne v. United States,* —— U.S. ——, 133 S.Ct. 2151, 2159, 186 L.Ed.2d 314 (2013). Obviously, death is essential to the penalty and punishment sought to be inflicted.

11. We are cognizant that the punishment for the acts of assaulting the victim were not increased; we rely on this quote to highlight that the focus in *ex post facto* law from the earliest days of this country has been on acts.

Further, in discussing recidivist statutes and *ex post facto* implications, courts have consistently noted that defendants are being punished not for the earlier criminal acts and convictions, but for the subsequent crime that occurred after the passage of the pertinent recidivist statute. *See Commonwealth v. Brown*, 741 A.2d 726 (Pa.Super.1999); *Commonwealth v. Scott*, 345 Pa.Super. 86, 497 A.2d 656 (1985); *Commonwealth v. Grady*, 337 Pa.Super. 174, 486 A.2d 962 (1984); *see also Commonwealth v. McCoy*, 895 A.2d 18 (Pa.Super.2006) *United States v. Hardeman*, 704 F.3d 1266, 1268 (9th Cir.2013) ("Supreme Court has long held that recidivism statutes do not violate the *Ex Post Facto* Clause because the enhanced penalty punishes only the latest crime and is not retrospective additional punishment for the original crimes"); *McDonald v. Massachusetts*, 180 U.S. 311, 313, 21 S.Ct. 389, 45 L.Ed. 542 (1901) ("The statute, imposing a punishment on none but future crimes, is not *ex post facto*.")

■■■ Thus, there is no *ex post facto* violation when a defendant commits a criminal act relevant to an element of the crime after a sentencing statute takes effect. Here, however, the acts which ultimately caused the victim's death were all committed prior to the passage of the law in question. Admittedly, Appellant is not being punished solely for the facts that occurred before the change in the law; indeed, he is being punished for the death of the victim, an event which transpired after the passage of the applicable statute.

Nonetheless, all the criminal acts that caused the victim's death happened before § 1102(d) became law. Phrased differently, Appellant took no action after imposition of the new law that would bring him within the ambit of the new sentencing law.[12]

■■■ As Justice Thomas has explained in a dissenting opinion discussing the original meaning of the federal *ex post facto* clause, "a retroactive increase in the punishment affixed to a crime renders an act 'punishable in a manner in which it was not punishable when it was committed,' *Fletcher v. Peck*, 10 U.S. 87, 6 Cranch 87, 138, 3 L.Ed. 162 (1810), which is sufficient for an *ex post facto* violation." *Peugh*, *supra* at 2095 (Thomas, J. dissenting). Justice Thomas, speaking for a majority of the High Court, has also opined that, "In accordance with this original understanding, we have held that the Clause is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dept. of Corrections v. Morales*, 514 U.S. 499, 504–505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995).

Cases discussing that an *ex post facto* violation occurs when a person is punished for a crime based on a statute passed after completion of the crime have utilized the terms "acts" and "crime" synonymously. *See e.g. Weaver*, *supra; see also Commonwealth v. Derk*, 895 A.2d 622, 626 (Pa.Super.2006) ("A state law violates the *ex post facto* clause if it was adopted after the complaining party committed the criminal

---

**12.** The Commonwealth's reliance on *Commonwealth v. Johnson*, 520 Pa. 165, 553 A.2d 897 (1989), in arguing that application of 18 Pa.C.S. § 1102(d) is not retroactive, is misplaced. In *Johnson*, the legal question was whether a statute of limitations for rape acted retroactively. While all the acts needed to complete the rape crime had been committed before the statute at issue was altered to in-

crease the statute of limitations, the new statute did not operate retroactively because the rape was not time barred by the former statute. *Johnson*, *supra* at 900 ("There is nothing 'retroactive' about the application of an extension of a statute of limitations, so long as the original statutory period has not yet expired.").

acts and 'inflicts a greater punishment than the law annexed to the crime, when committed.' "). Pointedly, this is likely because, as Justice Paterson explained in *Calder* so many years ago, the first, second and third *Calder* categories are closely intertwined. *See Calder, supra* at 397 (opinion of Paterson, J.) ("The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty; and therefore they may be classed together."). It is the rare case where the completion of all the criminal acts does not result in consummation of the crime at the same time.

Thus, while the Commonwealth is correct that the third *Calder* category cases that use the term "act" did not involve facts where the criminal offense was completed after the acts occurred, this argument proves too much. This is because the cases that continually define the third *Calder* category by using the words "crime," "offense," or "consummated crime" equally did not involve factual scenarios where differentiating between usage of the words acts, crime, or offense would have altered the outcome of the analysis. Phrased differently, the United States Supreme Court has never had occasion to distinguish the terms "criminal act" and "crimes" and instead has commingled their usage.

Although the crime of third degree murder was not consummated until the victim died, all of the criminal acts causing the victim's death were completed before the passage of the third degree murder sentencing statute at issue. Since the criminal acts that caused the victim's death were completed prior to the passage of § 1102(d), and that statute increased the penalty for the acts causing the victim's death, we find that Appellant was improperly sentenced in violation of the respec-

tive federal and Pennsylvania Constitution *ex post facto* clauses.

Judgment of sentence vacated. Case remanded for re-sentencing. Jurisdiction relinquished.

Judge GANTMAN files a Dissenting Opinion in which Judge ALLEN joins.

DISSENTING OPINION BY GANTMAN, J.:

I respectfully disagree with the majority's decision to vacate and remand the case for re-sentencing. Instead, I think the trial court correctly sentenced Appellant to a term of twenty (20) to forty (40) years' imprisonment for his third degree murder conviction, pursuant to 18 Pa.C.S.A. § 1102(d); and I would affirm the judgment of sentence. Hence, I dissent.

Appellant contends he "completed" the criminal deeds related to third degree murder before the 1995 enactment of 18 Pa.C.S.A. § 1102(d). Appellant asserts the trial court "retroactively" applied Section 1102(d) and imposed a sentence that violates the *ex post facto* clauses of both the state and federal constitutions, because the 1995 addition of Section 1102(d) increased the maximum punishment for third degree murder from twenty to forty years, and the court applied Section 1102(d) to "acts, conduct and events" which occurred before the effective date of that subsection. Appellant concludes the court should have imposed a term of imprisonment consistent with the sentencing statute in effect when Appellant attacked the victim in 1993.

Historically, settled law has held: "Murder is committed only when the victim of the assault dies." *Commonwealth v. Ramunno*, 219 Pa. 204, 208, 68 A. 184, 185 (1907). *See also* 18 Pa.C.S.A. § 2501(a) (including "death of another human being" as element of criminal homicide); 42 Pa.

C.S.A. § 5552(d) (explaining, in relevant part, that for purposes of commencement of statute of limitations: "**(d) Commission of offense.**—An offense is committed ... when every element [of the offense] occurs ...."). "[A] person who has been convicted of murder of the third degree ... shall be sentenced to a term which shall be fixed by the court at not more than 40 years." 18 Pa.C.S.A. § 1102(d).

Instantly, Appellant and his cohort brutally attacked the victim in 1993. The victim, however, did not die in 1993. On May 14, 1995, Section 1102(d) went into effect. The victim in this case finally succumbed to her injuries on September 17, 2007, which is the date the homicide occurred. The Commonwealth charged Appellant with criminal homicide on October 9, 2007, and a jury convicted Appellant of third degree murder on October 13, 2010. Using the statute in effect when the homicide occurred, the court sentenced Appellant on December 7, 2010, to twenty to forty years' imprisonment, pursuant to Section 1102(d).

Here, Appellant did not "commit" the murder until the victim died on September 17, 2007. *See Ramunno, supra.* Although the attack happened years before, there was no murder until the final element of the offense, the victim's death, actually occurred. In my opinion, the court did not "retroactively apply" Section 1102(d); rather, the court utilized the sentencing statute in effect at the time of the murder. Therefore, the court's sentence was proper because Section 1102(d) went into effect in 1995, before the murder occurred. *See Calder v. Bull,* 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648, —— (1798) (defining *ex post facto* law as "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed").

Contrary to Appellant's assertion, the offense at issue is murder, which occurred in 2007, when the victim died. Consequently, I agree with the Commonwealth's position that the court properly sentenced Appellant per the statute in effect at the time of the murder. Based upon the foregoing, I am convinced the sentence imposed did not violate the state and federal constitutions as *ex post facto;* and I would affirm.[1] Accordingly, I dissent.

---

1. I question whether Appellant is entitled to   any credit for time served.